# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| **JOELLEN MARANDA,**          ) | |
|          ) | |
|     **Plaintiff,**          ) | |
|          ) | |
|     **v.**          ) | **CAUSE NO. 1:09-CV-00261** |
|          ) | |
| **MICHAEL J. ASTRUE,**          ) | |
| **Commissioner of Social Security,**          ) | |
|          ) | |
|     **Defendant.**          ) | |

## OPINION AND ORDER

Plaintiff JoEllen Maranda appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Maranda was last insured for DIB on September 30, 1998 (her "DLI") (Tr. 53), so she

must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151,

1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled as of her

date last insured in order to recover DIB benefits).  Maranda applied for DIB on October 14,

2005, alleging that she became disabled *almost nine years earlier* on April 28, 1996. (Tr. 58-60.)

The Commissioner denied her application initially and upon reconsideration, and Maranda

requested a hearing. (Tr. 24-25, 42-49.)  On March 19, 2008, Administrative Law Judge ("ALJ")

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Terry Miller conducted a hearing at which Maranda (who was represented by counsel), her husband, and a vocational expert testified. (Tr. 385-432.)

On June 30, 2008, the ALJ rendered an unfavorable decision to Maranda, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs in the economy. (Tr. 12-21.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.)

Maranda filed a complaint with this Court on September 18, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Maranda alleges just one flaw with the Commissioner's final decision—that the ALJ improperly evaluated the credibility of her testimony about her limitations. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 9-13.)

## II. FACTUAL BACKGROUND[2]

### A. Background

As of her DLI, Maranda was forty-five years old; had a high school education and a degree and license in hairdressing; and possessed past relevant work experience as a hairdresser. (Tr. 53, 68, 393.) From 1984 through her DLI, Maranda operated a beauty shop out of her home as a sole proprietor. (Tr. 51.) However, since 1987 she never earned more than $2,000 a year, explaining that she receives "a lot of tax write-offs". (Tr. 51, 397.) Maranda alleges that she became disabled due to schizophrenic disorder, undifferentiated type. (Tr. 133.)

At the hearing, the ALJ asked Maranda to focus on the time period on or before her DLI.

---

[2] The administrative record in this case is voluminous (432 pages). Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

(Tr. 388.)  Maranda explained that she lives with her husband and their two daughters in a one-story home that has her beauty shop attached to it. (Tr. 392.)  She performs many of the household tasks, though her husband and daughters help her at times. (Tr. 407-08.)  Maranda elaborated that she has owned and operated her beauty shop for twenty-five years. (Tr. 394, 397.)  She works part-time Tuesday through Friday, adjusting her schedule so that she has at least a one-half hour break between appointments to rest. (Tr. 395.)  The number of customers she has per day ranges from one to six. (Tr. 396.)  She independently handles all of the finances, paperwork, advertising, computer work, and taxes for the business. (Tr. 398-99, 417.)  She testified that her business has decreased over the years because her "stress has gotten worse" and because fashion has trended away from permed hair. (Tr. 400.)  Maranda testified that she does not have difficulty dealing with most of her customers but that "picky" ones cause her stress. (Tr. 410.)

As to her symptoms, Maranda explained that she takes a lot of medications for sleeping and that when she wakes up, she sometimes cannot discern a dream from reality. (Tr. 402.)  She explained that when the frequency of these dreams increase, a schizophrenic episode is "right around the corner". (Tr. 402.)  She stated that she has been hospitalized twice for her schizophrenia. (Tr. 401-02.)  She reported, however, that she had been off of her medication for months prior to her second hospitalization. (Tr. 402-03.)  She said that sometimes her hands shake because she is nervous but that her medication helps to reduce that symptom. (Tr. 412.)  Maranda stated that she must rest or nap intermittently during the day so that her symptoms do not exacerbate and therefore she cannot work full-time. (Tr. 433-23.)

When asked to describe her typical day as of her DLI, Maranda states that she would get

3

her daughters up and ready for school and then prepare a meal in the crock pot. (Tr. 413.) She

would then be home when they returned from school and might prepare them a snack. (Tr. 414-

15.) When she was not operating her business or doing housework, she enjoyed reading,

wallpapering, upholstering, arranging flowers, and doing crafts. (Tr. 415-16, 418.) She also

stated that she planted flowers and attended her daughters' activities. (Tr. 409.) In the evenings,

sometimes she and her husband watched television. (Tr. 416.) She also said that she served as

church treasurer for seven years. (Tr. 419-20.) She incorporates rest periods into all of her

activities. (Tr. 423.)

### B. Summary of the Medical Evidence Prior to Maranda's DLI[3]

In April 1996, Maranda was hospitalized for nine days, reporting that she had

experienced auditory hallucinations during the past two weeks and an escalated degree of

emotional disturbances in the past year. (Tr. 105.) On mental status examination by Dr. Jay

Fawver, Maranda appeared very confused, demonstrated tangential thought processes with a

religious preoccupation, and had little insight; she was, however, receptive to treatment. (Tr.

106, 108.) At the time of discharge, she was cheerful, the auditory hallucinations had greatly

diminished, and no paranoid delusions were noted. (Tr. 107.) She was diagnosed with major

depression with psychotic features and assigned a current Global Assessment of Functioning

("GAF") score of 40 and a past year GAF of 80.[4] (Tr. 109, 112.) She was started on

---

[3] Maranda does not claim that she had any significant physical problems prior to her DLI. (Opening Br. 2.)

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). In contrast, a GAF score

medications. (Tr. 109, 112.)

After discharge, Maranda was treated at Lindenview Counseling with psychotherapy by John Ott, Ph.D., and medication management by Dr. Fawver. (Tr. 119-32.)  In June 1996, she reported shaking as a side effect of one of her medications. (Tr. 131.)  The next month she reported continued shaking but that she was "doing pretty well", although one or two days a week she did not want to go to work. (Tr. 131.)  In August, Maranda told Dr. Ott that she was taking her medications regularly and was doing a "little better all the time." (Tr. 130.)  She reported sleeping ten hours per night. (Tr. 130.)

In September 1996, Maranda reported to Dr. Fawver that she was "doing pretty good, but . . . wanting to sleep more", indicating that she had trouble getting up. (Tr. 129.)  She confided that her mind was not "wandering like it was" but that she encountered problems when she was bored. (Tr. 129.)  Dr. Fawver discontinued several of her medications. (Tr. 129.)  The next month, Maranda told Dr. Ott that since her medication adjustment, she did not sleep as much and was feeling "more normal". (Tr. 128.)  In November, Maranda reported that she had become shaky and depressed with an increase in Risperdal and experieinced increased irritability. (Tr. 127.)  In December she told Dr. Ott that she was doing better. (Tr. 126.)

In January 1997, Maranda reported to Dr. Ott that she was experiencing varying levels of depression. (Tr. 126.)  However, by the next month she reported that she was doing "okay" despite some fluctuation in her mood. (Tr. 125.)  In April, she reported that she was doing "pretty good" and had more energy, though she still experienced two or three bad days a week and felt more depressed when she was not busy. (Tr. 125.)  In May, Maranda reported that she

---

of 71 to 80 is indicative of transient symptoms that are expectable reactions to psychosocial stressors or no more than a slight impairment in social, occupation, or school functioning. *Id.*

was doing "very well overall" and felt "like [her] old self". (Tr. 124.)  In June and July, however, she reported that she was hearing voices. (Tr. 124.)  Despite a medication increase, Maranda reported no side effects but she also noted that sometimes she "forgets" to take her Risperdal. (Tr. 124.)  By September, Maranda told Dr. Ott that everything was going well again in that she was sleeping well, was not depressed, and did not have unusual thoughts or voices. (Tr. 123.)  In December, Maranda reported that she was taking herbs and experienced better concentration, clarity of thought, and good sleep. (Tr. 123.)  Dr. Fawver, however, discouraged her from using herbs because of the possible negative interaction with her medications. (Tr. 123.)

In May 1998, Maranda reported that she was doing "ok", though she complained that she had "intermittent spaciness". (Tr. 122.)  She stated that she has the "ability to calm herself down." (Tr. 122.)

### C.  Summary of the Medical Evidence After Maranda's DLI

In October 1998, Maranda reported that her mood was cheerful, she felt content, and she seemed "to be doing alright". (Tr. 122.)

In April 1999, Maranda stated that she had "been feeling good", had "good" sleep, a level mood, and she felt content. (Tr. 121.)  She denied any hallucinations and stated that she really wanted to get off some of her medications. (Tr. 121.)  In November, she reported increased stress and irritability, but her mood seemed okay. (Tr. 120.)

More than two years later, on June 8, 2001, Maranda was hospitalized due to "hearing voices again". (Tr. 133, 147-49, 339-40.)  She reported to Dr. Herbert Trier that she had stopped taking her medication the year before because she felt she did not need it. (Tr. 147, 340.)  She was discharged seventeen days later with a diagnosis of chronic schizophrenic disorder,

6

undifferentiated with acute exacerbation. (Tr. 133.)

From June 25, 2001, through February 2008, Maranda was treated at Dr. Trier's office for psychotherapy and medication management. (Tr. 154-55, 233-339.)

In February 2006, Donna Unversaw, Ph.D., a state agency psychologist, reviewed Maranda's record and concluded that prior to her DLI, Maranda was moderately limited in her ability to respond appropriately to changes in the work setting, but was otherwise not significantly limited in any normal workday activity. (Tr. 156-57, 160.)  Dr. Unversaw observed that when Maranda was on her prescribed medications she was quite functional and able to tend to her own needs and those of her children, but when she went off her medications, she experienced significant difficulty. (Tr. 158.)  Dr. Unversaw also noted that Maranda was able to tend to the daily operation of her beauty salon, which at the time included seeing six to ten clients a day. (Tr. 148.)  Dr. Unversaw opined that Maranda experienced mild restrictions in activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 170.)  Dr. Unversaw concluded that when Maranda takes her medications she is able to cope with the daily stressors of gainful employment. (Tr. 158.)  A second state agency psychologist later affirmed Dr. Unversaw's assessment. (Tr. 176.)

In January 2008, Dr. Trier penned a letter to Maranda in which he opined that it would not be in her best interest to work full time. (Tr. 232.)  Dr. Trier wrote that part-time work seems to have been appropriate for the past seven years due to the stress of preparing for a full-time job and completing the work involved. (Tr. 232.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 30, 2008, the ALJ rendered his decision. (Tr. 12-21.) He found at step one of the five-step analysis that Maranda had not engaged in substantial gainful activity from her alleged onset date through her DLI. (Tr. 14.) At step two, he concluded that Maranda had the following severe impairments: major depressive disorder with psychotic features and chronic

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

paranoid schizophrenia. (Tr. 14.)  The ALJ then at step three determined that Maranda's

impairment or combination of impairments was not severe enough to meet a listing. (Tr. 15.)

Before proceeding to step four, the ALJ assigned Maranda the following RFC and found

that Maranda's subjective complaints were "not credible to the extent they are inconsistent" with

such RFC:

> [T]hrough the date last insured, the claimant had the residual functional capacity
> to perform a full range of work at all exertional levels but with the following
> nonexertional limitations:  She is limited to simple, routine, repetitive tasks; few,
> if any, workplace changes; only brief and occasional interactions with others; and
> no work with the general public.

(Tr. 16.)  Based on this RFC and the VE's testimony, the ALJ concluded at step four that

Maranda was unable to perform her past relevant work as a hairdresser. (Tr. 20.)  The ALJ

concluded at step five, however, that she could perform a significant number of other jobs within

the economy, including janitorial work, folder, and mail clerk. (Tr. 21.)  Therefore, Maranda's

claim for DIB was denied. (Tr. 21.)

### C.  The ALJ's Credibility Determination Will Not Be Disturbed

Maranda's sole assertion upon appeal is that the ALJ improperly evaluated the credibility

of her testimony of debilitating psychological limitations.  Her argument, however, is

unpersuasive, and thus the ALJ's credibility determination will not be disturbed.

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at

435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's

credibility determination because the ALJ's decision was based on "serious errors in reasoning

rather than merely the demeanor of the witness . . . .").

Here, the ALJ concluded that while the medically determinable impairments could

reasonably be expected to produce the alleged psychological symptoms, Maranda's statements

concerning the intensity, persistence, and limiting effects of these symptoms as of her DLI were

not credible to the extent they were inconsistent with the RFC that he assigned. (Tr. 17.)  In

reaching this conclusion, the ALJ considered the objective medical evidence and medication

usage, observing that the evidence indicated that when Maranda was compliant with her

medications, she remained fairly stable with only brief periods of hallucinations. (Tr. 18-19, 158,

176); *see* 20 C.F.R. § 404.1529(c) (instructing courts to consider the objective medical evidence

and use of medication when analyzing claimant's subjective allegations); SSR 96-7p; *see*

*generally Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995); *Luna v. Shalala*, 22 F.3d 687,

690-91 (7th Cir. 1994).

In that regard, the ALJ noted that when Maranda stopped taking her medications in 2000,

she subsequently decompensated and was hospitalized the following year, bolstering his

conclusion that her medications controlled her symptoms. (Tr. 18, 147, 340.)  In fact, the ALJ

acknowledged that even Maranda and her husband both testified that her medications helped her

and that when taking them consistently, she was able to "pretty much" cope with daily activities.

(Tr. 17, 405, 426.)  The ALJ further observed that the medical records did not reflect that

11

Maranda experienced significant side effects from her medications. (Tr. 18.)

The ALJ also considered Maranda's daily activities in his credibility analysis. *See* 20 C.F.R. § 404.1529(c)(3)(i); SSR 96-7p; *Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility). That is, he noted that Maranda was active in parenting her two daughters, performing household chores, and volunteering as a church treasurer, and that keeping busy was therapeutic for her. (Tr. 18-19, 408-09, 413, 415-16.) He found it significant that Maranda was able to operate her part-time salon business independently for the past twenty-five years, which involved skilled work with significant customer contact, while also successfully performing these parenting, household, and volunteer activities. (Tr. 15, 18-19); *see Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (finding that the claimant's ability to work part-time undermined his claim of total disability, as did his other activities, including lawn-mowing, cleaning, and light construction).

The ALJ then reasonably inferred that operating her own business probably caused Maranda stress and mental fatigue and that if she had a simpler, less stressful job, which did not require constant dealing with the public, she could sustain work on a full-time basis. (Tr. 19.) In making this inference, the ALJ relied upon the state agency psychologists' conclusion that Maranda could cope with the daily stressors of gainful employment when taking her medications. (Tr. 18-19, 158, 176.)

Maranda raises several challenges to the ALJ's reasoning. None of her assertions, however, warrant a remand of the ALJ's credibility assessment, which as explained earlier, is entitled to special deference. *Powers*, 207 F.3d at 435. Maranda first asserts that the ALJ erred by failing to consider her statement to Dr. Patel upon admission to the hospital in 1996 that she

12

found housework "very stressful" (Tr. 112), and that she told her counselor in 2006 (eight years

after her DLI) that her daughters' pool parties, social activities, and ball games "make[] her

tired" (Tr. 260). An ALJ, however, "need not provide a complete written evaluation of every

piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Here, the

ALJ did indeed consider Maranda's claim that she easily becomes stressed (*see* Tr. 15, 17, 19),

and thus did "not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski*

*v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citation omitted).

Next, Maranda attacks the ALJ's inference that if she had a simpler, less stressful job

than her salon business, which requires constant dealing with the public, she could sustain work

on a full-time basis. (Tr. 19.) The ALJ, however, is entitled to make reasonable inferences from

the evidence before him. *See Stevenson*, 105 F.3d at 1155. Furthermore, his conclusion is

supported by the opinions of the state agency psychologists, who specifically concluded that

when Maranda takes her medication, she is able to cope with the daily stressors of full-time

employment. *See* 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and psychological

consultants . . . are highly qualified physicians and psychologists who are also experts in Social

Security disability evaluation."); *Ottman*, 306 F. Supp. 2d at 839 ("The regulations, and this

Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field

and the ALJ is entitled to rely on their expertise."). Therefore, Maranda's second assertion is

also unavailing.

In addition, Maranda challenges the ALJ's consideration of her volunteer work as a

church treasurer, asserting that her church activities were significantly impacted by her

psychological condition and that her volunteer work "do[es] not translate into an ability to work

full time." (Reply Br. 2.)  As explained previously, the ALJ is entitled to consider her daily

activities in assessing the credibility of Maranda's symptom testimony, *see* 20 C.F.R. §

404.1529(c); SSR 96-7p; *Schmidt*, 395 F.3d at 746-47, and he did not improperly equate her

church activities with an ability to work full-time. *Compare Schmidt*, 395 F.3d at 746-47

(considering claimant's performance of daily activities as a factor when discounting claimant's

credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v.

Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight

on a claimant's household activities in assessing the claimant's ability to hold a job outside the

home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).  Therefore, Maranda's third

argument is meritless.

Finally, Maranda contends that the ALJ erred by failing to consider the observations

recorded by the Social Security claims representative on October 18, 2005, that her thought

processes appeared slow and that she appeared depressed or discouraged, unable to think clearly

or quickly, and incapable of doing anything too taxing. (Tr. 64.)  However, as stated previously,

an ALJ need not provide a complete written evaluation of every piece of testimony and evidence.

*Diaz*, 55 F.3d at 308.  Furthermore, the claims representative observed Maranda seven year *after*

her DLI, and thus these observations shed no light on Maranda's condition on or before her DLI.

*See, e.g.*, *Stewart v. Astrue*, No. 1:08-cv-00209, 2009 WL 1766841, at *6-10 (N.D. Ind. June 23,

2009) (emphasizing that the claimant must provide evidence to show that he was disabled as of

his DLI, rather than currently disabled).  In contrast, at the hearing the ALJ more appropriately

instructed Maranda to focus her testimony on the time period on or before her DLI. (Tr. 388.)

Therefore, Maranda's final challenge to the ALJ's credibility assessment also falls short of

14

warranting a remand.

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Maranda's testimony of debilitating psychological limitations was not entirely credible, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Maranda.

SO ORDERED.

Enter for this 7th day of June, 2010.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
